[Butler v. Elyton Land Co.]

# Mary Butler *v.* Elyton Land Co.

### Bill in Equity for Specific Performance.

1. *Bastards; descent and inheritance from.*—Under statutory provisions regulating the inheritable rights of bastards (Code of 1886, §§ 1921-2), construed in connection with the general statute of descents (§§ 1915, 1924), when a bastard dies intestate, leaving no descendants, his real estate descends, not to his surviving mother, but to his half brother on the mother's side to her exclusion.

APPEAL from Birmingham City Court.

Heard before Hon. H. A. SHARPE.

The appellant Mary Butler, a non-resident negro woman, filed the bill in this cause praying that one James Going be decreed to hold certain real estate in the city of Birmingham have for her use and that the Elyton Land Company be ordered to make to her deed and title thereto, &c. The bill in substance avers that Mary Butler, the complainant, was the mother of two illegitimate sons, named Gus Peteet and Butler Whitney. The former, Gus Peteet, died intestate, unmarried and without descendants, owning a contract for purchase of certain real estate in Birmingham, part of the purchase-money having been paid, and for which the Elyton Land Company had given him a bond for title. After his death, his half brother Butler Whitney, claiming to be the sole heir of said Gus Peteet obtained possession of said bond for title, and having disposed of the same, it was finally transferred and assigned to one Going. On bill filed by said Going against the Elyton Land Company, said company was ordered to make, and did make title to said real estate to said Going. Mary Butler now files her bill, claiming to be the heir of her illegitimate son, Gus Peteet, and that the deed made to said Going by said Elyton Land Company is void. A demurrer to the bill, assigning as ground thereof that Mary Butler was not the heir at law of said Gus Peteet was sustained, and the bill was dismissed. The sustaining of the demurrer and dismissal of the bill is here assigned as error.

W. M. BROOKS, and BARNES & BARNES, for appellant.—1.

[Butler v. Elyton Land Co.]

The rights of the parties necessarily depend upon the provisions of the statute. At common law, bastards had no kindred and were incapable of inheriting or transmitting inheritance, save to their own descendants. He had no mother nor father, or brother, or sister, and neither the mother nor any of her children could inherit of a deceased bastard. If he died intestate and without issue living, the property of such bastard escheated.—1 Black. Com. 459; 2 Kent's Com. 212; 4 Kent's Com. 459. The common law has been modified in some respects by statutes in many States. In February, 1852, the General Assembly of Alabama adopted a code of statute laws, which had been prepared by commissioners thereto duly authorized. This Code contained two sections as to the law of descents and distributions as to bastards, numbered therein § 1578 and § 1579. The latter section (§ 1579) which needs be considered in this case, reads thus: "§ 1579. The mother or kindred of an illegitimate child on the part of the mother are, in default of children of such illegitimate child or their descendants, entitled to inherit his estate." This is the only statute which confers upon any person whatever the right to inherit from a bastard who dies without issue surviving. In plain and unmistakable terms, this right to inherit the estate of the bastard is expressly conferred upon the mother. There is no room for doubt or misconstruction. She stands first in order of those mentioned in the statute, who are entitled by virtue thereof to inherit the estate of the bastard who dies leaving no descendants. The identical condition of things conferring upon *her* the right to inherit, as provided for by the statute, now exists. Gus Peteet, her bastard son, is dead; he has left no descendants, and his mother is living and claims the property. The statute expressly and explicitly declares that in such case, *"the mother is entitled to inherit"* the estate of such illegitimate child. Yet the solicitors for the defendants contend, and the court below decided, that the statute did not mean what it expressly declares, and that the mother is not entitled to the inheritance! Every statute ought to be so interpreted, as to give meaning to each clause and word, if possible.—*Ex parte Dunlap,* 71 Ala. 73; *Parker v. Hubbard,* 64 Ala. 203. When a statute is plain and unambiguous, whether expressed in limited or general terms, the legislature is presumed to have meant what they have plainly expressed, and hence no room is left for construction.—*Reese v. State,* 73 Ala. 18; *Carlisle & Jones v.*

[Butler v. Elyton Land Co.]

*Goodwyn*, 68 Ala. 137; 64 Ala. *supra*. 2. But it is said on behalf of appellees, that the old statute in Clay's Digest has never been repealed, and that the statute in the Code is, so far as it conflicts with the old statute, of no force or effect. That statute was enacted in 1822, and is found in Clay's Digest, § 4, p. 169, and reads thus: "Bastards shall be capable of inheriting or transmitting inheritance on the part of their mother, in like manner as if they had been lawfully begotten of such mother." . . . The remainder of this section and all of section 5, on same page, relates to the distribution of personal estate. Now, these statutes were not included in the Code of 1852, or 1867, or 1876, or in the present Code, but in the place thereof two sections were incorporated in the Code of 1852, and in each Code since that time. Having been omitted from the Codes of 1852, 1876 and 1886, they are for that reason repealed.—*Parker v. Hubbard*, 64 Ala. 203; *Carmichael v. Hays*, 66 Ala. 543; *Hendon v. White*, 52 Ala. 597. Again: A statute intended as a revision of the subject-matter of a former statute and as a substitute therefor, is, to the extent of the revision, a repeal of the former statute.—*Scott v. Simons*, 70 Ala. 352; 64 Ala. 282; *Lehman, Durr & Co. v. Robinson*, 59 Ala. 231. This case in 59 Ala. is a careful and elaborate collection of the authorities bearing on the subject of the repeal and construction of statutes. "A construction which leaves to a sentence or clause of a statute no field of operation, should be avoided, if any other reasonable construction of the language can be given."—59 Ala. *supra*. "If there be a material alteration in the language used, . . . it is to be inferred the legislature knew how to use terms applicable to the subject-matter."—59 Ala. *supra*. "The judges ought not to make any construction against the *express letter* of the statute."—59 Ala. *supra*. Other citations in 59 Ala. are equally pertinent. 3. The contention that the commissioners who prepared the Code of 1852 had no lawful authority to change old statutes, or to omit them from the Code, or frame new statutes and incorporate them therein, is without any foundation. The act of February 5, 1852, authorized the commissioners to prepare a code of the statutes then existing, but the act of February 9, 1851, authorized them to change or omit the old statutes and frame new ones, and the commissioners acted accordingly. The Code thus prepared approximates the title applied to it: "A body of laws established by the authority of the State, and designed to regulate com-

[Butler v. Elyton Land Co.]

pletely, so far as a statute may, the subject to which it re-
lates." In its interpretation and construction, it is necessary
so to regard it, if full effect is to be given to the legislative
intention on its adoption.—*Hendon v. White*, 52 Ala. 507;
*Barker v. Bell*, 46 Ala. 216. The legislature adopted this
Code, and provided, that "all acts of a public nature not em-
braced in this Code are hereby repealed." The statute in
Clay's Digest is an extract from an old Virginia statute,
which was adopted in Kentucky and Ohio when they became
States. Before it was enacted in Alabama, it had been judi-
cially construed in Kentucky, Ohio, and by the Supreme
Court of the United States, [ *Stevenson's Heirs v. Sullivant*,
5 Wheat. 207, 240, note, ] holding that one bastard is not
entitled to inherit from another bastard, though children of
the same mother. These decisions hold that the mother may
inherit from her deceased bastard child to the exclusion of
any other bastard child. Now, this statute was enacted in
this State while these decisions, so construing it, were in full
force and unimpaired by any decision to the contrary. But
in the progress of time different opinions were declared by
individuals, and as if to set all controversy at rest, the legis-
lature expressly conferred upon the *mother* the right to in-
herit. It is well established, that the disabilities of a bas-
tard at common law are removed only to the extent that the
statute plainly removes them, and no farther.

WEBB & TILLMAN, *contra*.—1. Section 1922, Code 1886
(§ 2259, Code 1876), is a codification of the act of the leg-
islature, approved December 18, 1824, p. 49, Acts 1824.
See Aiken's Dig. 129; Clay's Dig. 168, §§ 4, 5. When in
codifying doubt or ambiguity is created as to construction,
courts will refer to original statute and their history and give
effect to statute as originally framed.—*E. T. & V. R. R. v.
Hughes*, 76 Ala. 590; 71 Ala. 594. The language of the
act of December 18, 1824, plainly sustains the view that the
brother of the bastard in this case is the heir. 2. Appellant
relies on case of *Stephenson's Heirs v. Sullivant*, 5 Wharton,
as excluding children of the mother. This construction of
the Ohio Statute was overruled in *Lewis v. Eutsler*, 4 Ohio
St. 354, citing *Burlington v. Fosby*, 6 Vermont, 83, and
Reeves Law of Descents, p. 96, and Reeves Domestic Rela-
tions, 275 (Ed. of 1846). See also 56 Am. Dec. 264; 19
Am. Rep. 556; *Briggs v. Greene*, 10 R. I. 495; *Garland v.
Harrison*, 8 Leigh, 368; *Hepburn v. Dundas*, 13 Grat. 219;

[Butler v. Elyton Land Co.]

*Bennett v. Toler*, 15 Grat 588; Schouler's Dom. Rel. 381.

SOMERVILLE, J.—This case turns on the proper construction of our statute regulating inheritances between bastard children and their mothers and other kindred, the contest here being one in effect between the mother and uterine brother of a deceased bastard, who died seized and possessed of the real estate in controversy. These sections of the Code (1886) read as follows:

"§ 1921. Every illegitimate child is considered as the heir of his mother, and inherits her estate in whole or in part, as the case may be, in like manner as if born in lawful wedlock.

§ 1922. The mother, or kindred of an illegitimate child on the part of the mother are in default of children of such illegitimate child, or their descendants, entitled to inherit his estate."

The inquiry is, whether the mother, Mary Butler, under this statute, takes the property of her deceased illegitimate son, Gus Peteet, to the exclusion of the latter's half brother, one Butler Whitney, of the blood of the same mother.

It is contended for appellant that the latter section (§ 1922) must be construed to mean, that, in default of children of an illegitimate child, the *mother* shall *first* inherit, and if there be *no mother* living at the time of descent cast, *then* the kindred of the illegitimate child on the part of the mother shall be entitled to take his estate, and not otherwise.

The appellee, on the contrary, contends that these sections of the Code are not complete within themselves, but are a part of an entire system of statutes on the subject of descents and distributions, and are to be construed *in pari materia* with them.

The judge of the City Court adopted the latter view of the statute, and we fully concur with him in this conclusion.

These sections are clearly not complete within themselves. It is declared that the *mother or kindred* on the part of the mother shall inherit. The word "kindred" means relations by blood, and includes collateral as well as lineal relations. It includes children of an intestate and their descendants, brothers and sisters, nieces and nephews, cousins, uncles and aunts, and other next of kin. How are these numerous kindred to inherit, and which, if any of them, are to be preferred? And what is to be the share of each one's inherit-

ance? Necessarily these inquiries are to be answered by reference to the statutes of descent and distributions, which form a part of the same chapter and article in the Code that embrace the sections under consideration. Except so far as declared otherwise, the rule of descent for real estate must be governed by section 1915 of the Code, 1886, and of personal property by section 1924, which precisely correspond to sections 2252 and 2261 of the Code of 1876, the law in force at the time of the death of the intestate in the year 1883. There is nothing in the statute indicating a purpose to give the mother a priority of right over other kindred, whose rights are preferred by the statute of descents. If this had been the legislative intent, it was easy of expression, as appears in the New York statute, which declares that if an illegitimate child die intestate, without descendants, the inheritance "shall descend to his mother; if she be *dead* it shall descend to the relatives of the intestate on the part of the mother, as if the intestate had been legitimate."—3 Rev. Stat. N. Y., p. 42, § 14 (1849).

This construction is a necessary result from the settled rule that, in construing a doubtful statute, all statutes *in pari materia*, or relating to the same general subject-matter, are to be taken and examined together in order to arrive at the legislative intent. "All acts which relate to the same subject," said Lord Mansfield in *Rex v. Loxdale*, 1 Burr. 447, "notwithstanding some of them may be expired, or are not referred to, must be taken to be one system, and construed consistently."

We are also authorized to examine, for the same purpose, the original statute from which the present law was first codified, in the form it now appears, which is the same as that in the Code of 1852.—Code, 1852, §§ 1578–1579. The language of that Code is identical with that of all other subsequent Codes of the State down to the one now in force. The law, prior to codification in the present form, as taken from the act of 1824, read as follows:

"§ 4. Bastards shall be capable of inheriting, or of transmitting inheritance on the part of their mother, in like manner as if they had been lawfully begotten of such mother; and shall also be entitled to a distributive share of the personal estate of any of their kindred, on the part of their mother, in like manner as if they had been lawfully begotten of such mother.

"§ 5. The kindred of any bastard on the part of his

[Butler v. Elyton Land Co.]

mother, shall be entitled to the distribution of the personal estate of such bastard, in like manner as if such bastard had been lawfully begotten of his mother."—Aikens Dig. (2d Ed.) (1836), p. 129; Clay's Ala. Dig. (1843), p. 168–169.

This old statute differs in phraseology, but not materially in signification from the one now embraced in the Code of 1886, brought forward, as we have said, from the Code of 1852. It was intended to remedy the cruel and rigorous policy of the common law in reference to bastards, by which was visited on these unfortunates a stigma which more properly belonged to their parents, and at the same time to deal with the erring mother in a more liberal spirit of justice as well as of Christian charity. By that law a bastard was *nullius filius* as to the whole question of inheritance. He had no mother or father, no brothers, sisters or other kindred—no inheritable blood, and hence no capacity to inherit or transmit inheritance, save to the heirs of his own body. The supposed origin of this rule has been asserted to be the discouragement of a promiscuous and illicit intercourse between the sexes. It is at least debatable whether precisely the opposite policy, conferring equal rights of inheritance upon legitimate and illegitimate off-spring, would not better preserve the high moral duty of chastity between the sexes. This was to a certain extent the tendency of the civil and Jewish law, as well as of many other ancient codes, now every where admitted to be more humane and enlightened than the rule of the common law on this subject. The general spirit of modern legislation has accordingly been to sweep away to a great extent this unjust and illiberal policy of the English law, and to not only permit bastards to inherit from their mothers, but also in many instances to provide for their legitimation by the subsequent marriage of their parents, or by written declaration made for that purpose, and duly recorded, and to authorize them to transmit inheritance to kindred of their mother's blood both collateral and lineal. The laws of Scotland, France, Holland and Germany all provide that the intermarriage of the parents after the birth of a child shall render such child legitimate—a rule of the canon law, the adoption of which the ecclesiatics urged in vain upon the English Parliament in the reign of Henry the Third. This has long been the law of Alabama, legitimation following from the intermarriage of the reputed parents, and recognition by the father.—Aiken's Dig. p. 129, § 3; Code 1886, §§ 2364–2369.

[Butler v. Elyton Land Co.]

This construction as to the heritable rights of bastards and their collateral kindred was placed upon the Virginia statute enacted in 1785 and carried into the Code of 1819 of that State. Our old statute, as appearing in Aiken's and Clay's digests, seems to be copied from the Virginia Code. That law was construed by the Virginia court of appeals in *Garland v. Harrison*, 8 Leigh. 368, decided in 1837, an exhaustive and learned opinion being delivered by three of the five judges. They all agreed that the purpose of the statute was to confer on bastards not only the capacity to inherit from their mothers just as they would do were they legitimate children, but also the power to transmit inheritance to his maternal kindred, both collateral and lineal, as if they had been born in lawful wedlock. The object of the statute, said Judge Parker, was to make bastards " *quasi* legitimate on the maternal side; to give the bastard a mother and maternal kindred, and to make them heritable from each other in the order prescribed by the law of descents, as if the bastards had been lawfully begotten of such mother. It places this line, in respect to inheritance, precisely in the situation it would be in, if one born in lawful wedlock should die leaving no paternal kindred." Judge Brockenborough said: " A bastard may inherit on the part of his mother, in like manner as if he were the legitimate son of his mother. He may, therefore, inherit from his mother, or from his maternal grand-parents, in the direct line, or from his maternal uncle and aunt, or great uncles and great aunts, in the collateral, and a half portion from his legitimate or bastard half brother, in the same manner that a legitimate son could inherit from his legitimate half brother." Judge Tucker construed the statute, in like manner, to render bastards "capable of inheriting from *all his kindred* on the part of his mother, whoever they might be." The whole court vigorously repudiated the soundness of the decision of the United States Supreme Court in the case of *Stevenson's Heirs v. Sullivant*, 5 Wheaton 207, decided in the year 1820, and relied on for authority in this case by appellant's counsel, in which that court had come to a different conclusion in construing the Virginia statute, holding that it prescribed transmission of inheritance lineally but not collaterally on the part of the mother of a bastard—in other words that it conferred on a bastard capacity to inherit by descent immediately or through their mother in the ascending line, and to transmit the same to their line of descendants, in like manner,

as if they were legitimate, but did not authorize brothers, sisters, or other collateral kindred even on the mother's side to inherit from them.

The question came before the Virginia court again in *Hepburn v. Dundas*, 13 Grat. 219, decided in 1856, and still again four years later in *Bennett v. Toler*, 15 Grat. 588, and the case of *Garland v. Harrison*, 8 Leigh, 368, was, after renewed discussion, adhered to and re-affirmed.

The Vermont statute provided that "bastards shall be capable of inheriting and transmitting inheritance on the part of the mother, as if lawfully begotten of such mother"—the precise language of section four of the Alabama law as cited above from Aiken's and Clay's Digests. It was held in the *Town of Burlington v. Fosby*, 6 Vt. 83, decided in 1834, that under the statutes of descents and distributions one illegitimate child could inherit from another illegitimate child of the same mother—which is the precise question arising in this case.

The Ohio statute is in identical language, and the Supreme Court of that State in *Lewis v. Eutsler*, 4 Ohio St. 354, decided in 1854, repudiated the construction placed on the Virginia statute by the United States Supreme Court in *Stevenson's Heirs v. Sullivant*, 5 Wheat. 207, *supra*, and followed the Vermont decision, where a like statute, as we have seen, was construed. They without scruple overruled the case of *Little v. Lake*, 8 Ohio, 289, decided in 1838, in which *Stevenson v. Sullivant* had been followed.

It is observable that in none of these cases is there any reference made to the case of *Garland v. Harrison*, 8 Leigh, 368, *supra*.

In *Briggs v. Greene*, 10 R. I., 495, however, the authority of the Virginia case is expressly adopted in construing a similar statute in Vermont, and that of the United States Supreme Court in *Stevenson v. Sullivant* is repudiated. It was accordingly held, under a statute, precisely like the one in Virginia and the former one in Alabama, that bastard children of the same mother are capable of transmitting inheritance on the part of the mother, and when a bastard dies intestate, leaving a bastard sister by the same mother, her estate will pass to that sister.

Opposed to this view in the case of *Bent v. St. Vrain*, 30 Mo. 268, decided in 1860, which follows the United States Supreme Court, without noticing the Virginia decisions; and *Remmington v. Lewis*, 8 B. Mon., 606, decided in 1848, which omits to notice any of the foregoing cases.

[Abney et al. v. DeLoach, Adm'r, et al.]

We adopt the view of the Virginia court as being more in accordance with the principles of justice, and the enlightened and liberal policy of modern legislation on this subject. *Simmons v. Bull*, 56 Amer. Dec. 263, *note;* Schouler's Domes. Relations, 381; 2 Kent Com. (12th Ed.), *208–*214. "Our law of descents," as said by Judge Tucker, in *Garland v. Harrison, supra*, "was formed in no small degree upon the human affections; the legislature very justly conceiving that the object of a law of descent was to supply the want of a will, and that it should therefore conform in every case, as nearly as might be, to the probable current of those affections which would have given direction to the provisions of such will. Under the influence of these opinions," he adds, "they legislated in reference to bastards." An English Judge long ago said, in harmony with the same idea: "The statute of distributions makes such a will for the intestate, as a father, free from the partiality of affections, would himself make; and this," he said, "I call a parliamentary will."—*Edwards v. Freeman*, 2 P. Wms. 441.

We accordingly hold, that, under our present statute of descents and distributions, the brother of the deceased intestate bastard, by the same mother, is entitled to inherit land of which such intestate dies seized, to the exclusion of the mother.

The chancellor so held, and his decree sustaining the demurrers to complainant's bill is affirmed.